UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No. 25-cr-0322 (LLA) |
| : | |
| PETER WILLIAMS, : | |
| : | |
| **Defendant.** : | |

### DEFENDANT PETER J. WILLIAMS
### MEMORANDUM IN AID OF SENTENCING

Defendant, Peter J. Williams, by and through undersigned counsel, submits this Memorandum in Aid of Sentencing following his guilty plea to two counts of Theft of Trade Secrets, in violation of 18 U.S.C. § 1832. From the outset, Mr. Williams accepted full and unqualified responsibility for his conduct. As reflected in his letter to the Court,[1] and in his actions since the offense, Mr. Williams has undertaken extraordinary and sustained efforts to acknowledge the wrongfulness of his conduct, mitigate the harm he caused, and confront the consequences of his actions with honesty and humility.

Until the instant offense, Mr. Williams lived a life defined by responsibility, public service, and unwavering compliance with the law. He had no prior contact with the criminal justice system either in the United States or in Australia, his home country. Mr. Williams served honorably in the Royal Australian Air Force and as a public servant in the Australian intelligence community before transitioning to the private sector to work for the Australian subsidiary of a U.S government contractor. Throughout his adult life, he remained gainfully employed and devoted himself to his family as a husband and the father of two young children.

Against that backdrop, Mr. Williams agrees that the offense conduct—misappropriating trade secrets from his employer—was profoundly misguided and foolish. He fully and unequivocally

---

[1] Peter Williams' letter is included as *Attachment No. 1*.

1

accepts responsibility for his actions. He would like the Court to know that his failings are not indicative of the character he has exhibited throughout his career and personal life. Instead, they are the result of an unfortunate period of extraordinarily poor judgment exacerbated by severe job stress and exhaustion that contributed to conduct he acknowledges was reckless, harmful, and above all else, wrong.

The consequences of Mr. Willams' conduct have been severe and will be enduring. They have forever changed the trajectory of an otherwise exemplary personal and professional life. He has permanently lost the career he spent decades building, along with his professional reputation and standing in the community. Those losses are not speculative, nor will they fade with the passage of time. They will continue to affect Mr. Williams, his wife, his two young children, and his extended family long after he has served any term of incarceration ordered by this Court.

Mr. Williams accordingly asks the Court to impose a sentence that, while reflecting the seriousness of the offense, also acknowledges the totality of his life, his prompt and complete acceptance of responsibility, and the profound collateral consequences that have already served as powerful punishment and deterrence.

I.      THE ADVISORY SENTENCING GUIDELINES RANGE

Mr. Williams agrees with the calculation of the Pre-Sentence Report ("the PSR") of the Sentencing Guidelines, which assessed an Offense Level of 29, with a Criminal History Category of I, and produced an advisory Sentencing Guidelines range of 87 to 108 months of incarceration. PSR ¶ 104. Calculating the advisory Guidelines range is only the first step in determining an appropriate sentence. The Court should then make an individualized assessment based on the facts presented. If it decides that an outside-Guidelines range is warranted, it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007).

Due to his status as a non-U.S. citizen, Bureau of Prisons policy "precludes him from eligibility for participation in certain programs, or from other considerations as an inmate in the U.S. Bureau of Prisons while serving the sentence for the instant offense." PSR ¶ 128. "Title 18 USC § 3642(c) authorizes the U.S. Bureau of Prisons, to the extent practicable, [to] assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed twelve months of the last 10 percent of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry to the community." PSR ¶ 129. In *Lartey v. Department of Justice,* 790 F. Supp. 130, 133 (W.D. La 1992), the Court determined that the right to participate in pre-release programs only applies to prisoners who are being released to a community within the United States, thereby excluding deportable aliens.

Thus, Mr. Williams' status as an Australian national renders him ineligible for minimum-security placement and halfway-house placement, regardless of his offense level, criminal history, or institutional conduct. The D.C. Circuit has addressed this disparity by holding that a downward departure may be appropriate if a defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of confinement. *See U.S. v. Smith,* 27 F.3d 649, 651 D.C. Cir 1994).[2] *See* PSR ¶ 128-30

## II.    SECTION 3553(a) FACTORS

In the post-*Booker* era, the Sentencing Guidelines are advisory, not mandatory. A sentencing court, therefore, must consider all of the factors set forth in 18 U.S.C. § 3553(a) and impose a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. *See* 18 U.S.C.

---

[2] "A deportable alien is automatically ineligible for such benefits unless "he meets three qualifications – verified strong family/community ties in the United States, a verified history of domicile in the United States (five or more years), and a verified history of stable employment in the United States" Federal Bureau of Prisons, Program Statement 5100.08: Security Designation and Custody Classification (Sept 12, 2006).

§ 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005). Section 3553(a)(2) directs that the sentence imposed must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The advisory Estimated Guideline range in this case is largely based on a stipulated loss calculation under U.S.S.G. § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft) that relies on economic assumptions rather than proven economic harm. Courts facing trade-secret prosecutions have repeatedly noted that projected research and development costs, anticipated market valuations, and similar economic estimates often lack reliable empirical support and can lead to offense levels that exaggerate actual culpability.

Mr. Williams is a first-time offender with a longstanding record of stable, productive employment, no history of violence, and no evidence suggesting an intent to inflict concrete economic injury. These characteristics, together with a stipulated but inherently imprecise intended-loss projection, support an application of the Guidelines that reflects measured accountability.

### III.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

The nature and circumstances of Mr. Williams' offense are accurately reflected in the statement of offense included as part of the plea agreement and in the offense conduct portion of the PSR. See ECF, Doc.7; PSR ¶¶ 10-27. Mr. Williams acknowledges that his conduct fundamentally undermined his employer's trust and the standards he held for himself.

What matters at sentencing is whether the term of imprisonment and financial penalty are "sufficient, but not greater than necessary" to achieve the purposes set forth in 18 U.S.C. § 3553(a). When the offense conduct is evaluated objectively and balanced against Mr. Williams' personal history, character, and post-offense conduct, we submit that a lengthy custodial sentence is neither

necessary nor justified.

It is important to understand that the offense conduct *does not* involve the theft of classified information or the sale by Mr. Williams of sensitive products to a foreign government. While his former employer, Company One, has government-sponsored projects, the capabilities involved here are commercial products. They are owned by Company One and have been developed internally or through external commercial arrangements with other companies. The products do not hold a national security classification and are developed on a network that has no capability or accreditation to hold classified information.[3]

Moreover, although Mr. Williams sold Company One's products to a software broker located in Russia, that entity (Company Three), is not owned by the Russian government and has clients that are both private and government organizations. There is no evidence that Mr. Williams knew or intended that Company Three would re-sell the products to Russia or any other foreign government. If the Government believed that to be true, this case would involve different, more serious, charges.

Mr. Williams acknowledges that he caused harm to the intelligence communities of the United States and Australia. He is sincerely remorseful and apologizes to his former colleagues and the other individuals who dedicate their careers to protecting our nation and its allies against cyber threats from malign actors. Importantly, there is no evidence that Mr. Williams ever *intended* to damage national security, although he now recognizes that was a consequence of his actions. He had access to Company One's entire suite of products but sold only those products which he believed were least likely to create harm. He does not offer that as an excuse, but it is nonetheless accurate. He acknowledges the security

---

[3] Company Two, the parent company of Company One, designates its subsidiary a commercial entity because of this, and thus Company One is not required to be held to the same financial standards as a classified organization for per diems, software sourcing, etc. Company One has the ability to share its products with other commercial entities without Government permission or notification, again highlighting the commercial nature of the capabilities.

risks and expenditures that were caused by his conduct, as reflected in the two Victim Impact Statements ("VIS"). However, to the extent the VIS imply that he knowingly assisted the Russian government and that a "significant period of incarceration" would be appropriate, they should be afforded limited weight as not rooted in fact or the statutory sentencing framework.

Sentencing determinations are ultimately governed by the statutory framework set forth in 18 U.S.C. § 3553(a), the advisory Sentencing Guidelines, and the evidentiary record developed through the adversarial process, not by the subjective penal views of Government personnel. The VIS, while providing understandable perspectives, cannot substitute for the Court's independent obligation to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the purposes of sentencing. Principles of fairness preclude reliance on allegations which have not been subjected to evidentiary standards or adversarial scrutiny. *United States v. Lemon,* 723 F.2d 922, 933 (D.C. Cir 1983), citing *Gardner v. Florida,* 430 U.S. 349 (1977) (requirements of due process continue to operate during sentencing).

This case, as shown by Mr. Williams' plea agreement, involves the misappropriation and sale of commercial products to a commercial entity – not collaboration with a foreign government or intention to harm national security. Mr. Williams fully accepts responsibility for that conduct.

## IV.   PERSONAL CHARACTERISTICS AND CIRCUMSTANCES

Mr. Williams is 39 years old a citizen of Australia. He has no criminal record and no past contact with the criminal justice system. PSR at ¶¶ 50-55. He grew up in a lower-middle-income household in Australia. His hobbies included mathematics and computers. PSR at ¶¶ 59-61. His life before this offense reflects decades of lawful, productive conduct. He has been a devoted spouse, parent, and provider, with strong community ties and a consistent history of employment and professional achievement. PSR at ¶¶ 57-63.

Mr. Williams' wife describes her husband as "someone who has dedicated himself to working

in computer science, cryptography, and cyber security. He loved what he did and believed he had a positive impact. She witnessed the decline in his health due to what she opined was increased stress. The last few years, his work and travel dictated everything he did in life, and the family accepted that they would "grab moments of family and happiness in the snippets of time [they] got." PSR ¶ 63. She is "gutted" by his offense conduct; however, she never felt anger or resentment in the way people expected. She described Mr. Williams as the sole breadwinner for the family who handled all financial and administrative aspects of their lives. Should her husband be sentenced to a custodial sentence, she would be devastated. To imagine their children growing up without him for a period of time, is "beyond words." PSR ¶ 63.

Trying to explain how her husband could deviate from the high standards that have defined his life, she said "In the years following the global pandemic, the intensity of my husband's work increased substantially. He carried not only operational and financial responsibilities, but also the emotional burden of supporting staff through periods of stress, restructuring, and uncertainty. He often prioritized the needs of others above his own, remaining composed under pressure while disregarding signs of serious burnout and declining mental health. I urged him on multiple occasions to step away from his role, but he felt a deep obligation to those who depended on him." [4]

Mr. Williams' brother is similarly devastated and confused about how his younger sibling could have strayed so far from the path he had followed his entire life. He has no satisfactory answers but noted that "Peter's behavior during that period is completely out of character. Throughout his life, he has demonstrated strong family values, reliability, and integrity. His dedication to his country and the ideals it represents is shown by the long-time positions he has held with the Australian Air Force and intelligence services. Peter is a devoted father and husband who consistently prioritizes his family.

---

[4] Mrs. Williams' letter to the Court is included as *Attachment 2*.

Despite demanding work that required constant international travel, at times involving multiple countries within the same week, he consistently made it a priority to bring his wife and children back to Australia to spend time with our wider family." Trying to find an explanation for Mr. Williams' conduct,[5] his brother speculated that:

> Peter's work responsibilities required frequent travel between Canada, the United States, the United Kingdom, and New Zealand. The travel schedule was relentless, as he gave me access to Flighty (travel app) so I could keep track of his locations. Over time, it took a substantial physical and emotional toll on him. Whenever he returned to Sydney and we met at my home or his, it was clear how tired and worn down he had become as he would collapse onto the couch and dose off. He also suffers from chronic back issues resulting from an injury sustained during his service in the Australian Defence Force. The constant international travel and the stress of his employment responsibilities aggravated these injuries further and he wore a back brace to help relieve the pain in addition to taking strong pain relief medication.
>
> I believe the cumulative weight of his personal and professional responsibilities, combined with the financial pressure Peter felt as the sole income earner for his family, has contributed to the circumstances in which his poor decision was made.

Since the offense conduct, Mr. Williams has engaged in meaningful rehabilitation, including mental-health counseling focused on decision-making under stress. Mr. Willaims' wife and brother indicated that he has been depressed for several years. Mr. Williams shared with the Court's Pre-Sentence Officer that

> … he first began experiencing symptoms of depression and anxiety in early 2020. He was working a lot, traveling, and missed his family. He was initially diagnosed with depression and anxiety one year ago by a physician in Washington, DC [unspecified]. He thought he was burnt out from work; however, he confided in a friend, who suggested he see someone. He was eventually referred to a physician, [name and organization deleted] in August 2025 and has weekly/individual sessions.

PSR ¶¶ 70-72. These efforts reflect genuine remorse and a sustained commitment to seek help for his depression and pull his life back together for the sake of his wife and young children.

---

[5] The letter to the Court from Mr. Williams' brother is *Attachment 3*.

## V. A SENTENCE WHICH IS, AT MOST, IS AT THE BOTTOM OF THE GUIDELINES RANGE IS CONSISTENT WITH § 3553(a) AND THE INTERESTS OF JUSTICE

When viewed through the lens of proportionality and individualized assessment, this case deserves, at most, a bottom-of-the-guidelines sentence. A sentence emphasizing accountability, restitution, and rehabilitation would fully satisfy the statutory goals of sentencing without imposing punishment greater than necessary.

Mr. Williams stands before the Court not asking for sympathy but accepting responsibility. He understands that he failed his nation, employer, and family. He will carry that knowledge for the rest of his life. The Court can impose a sentence that reflects the seriousness of the offense while also recognizing that Mr. Williams is not defined by his worst decisions and that, in this case, justice does not require the blunt instrument of prolonged incarceration.

Mr. Williams allowed his own emotional failures, his inability to reconcile his devotion to his family with the demands of work, to metastasize into criminal conduct. Instead of honestly confronting his guilt for being absent from their lives because of work demands, he tried to compensate by purchasing vacations, luxury clothing, jewelry items, and a newly renovated house in the District of Columbia. That was clearly a distortion of the devotion he owed to his family. Mr. Williams sees that now and will deal with the consequences long after he completes his sentence.

Mr. Williams does not claim stress, or job and family pressures as an excuse for his conduct. He acknowledges that attempting to assuage his remorse about extended absences from his family through the conduct exhibited here reflects a personal failure. It was never Mr. Williams' intent to harm his employer or national security. While his actions were unquestionably unlawful, they were transactional, and not exploitative.

Since his arrest, Mr. Williams has demonstrated a genuine recognition of the seriousness of the offenses to which he has pled guilty and the harm his conduct caused. From the earliest stages of

this matter, Mr. Williams has done everything reasonably possible to accept responsibility and mitigate the damage he caused. Immediately upon being confronted by the FBI, he cooperated fully and surrendered all available assets to the Government. By so doing, he saved the Government an extraordinary amount of time, effort, and expense, while also conserving the limited resources of this Court.

Throughout this legal process, Mr. Williams has endured relentless public condemnation, both in the United States and in his home country. His family members have been harassed by the media and the public. He has been abandoned by friends, shunned by colleagues, and subjected to intense public humiliation and disgrace. Despite these circumstances, he has owned his conduct and its consequences.

Mr. Williams fully acknowledges the profound shame and collateral harm that his actions have inflicted upon his wife, his two young children, and his extended family. Both his parents live in Australia and are elderly. Mr. Williams knows he may never see them again. *See* PSR ¶ 64. He recognizes that this suffering is entirely of his own making and that authentic remorse is measured by what he has done since the offense, not how eloquently he apologizes. He respectfully seeks a sentence that is fair, proportionate, and consistent with sentences imposed in comparable cases.

In assessing just punishment, the Court may properly consider penalties that extend far beyond incarceration. Mr. Williams has already paid, and will continue to pay, a heavy price, including:

(1) He has permanently lost his career and professional standing.

(2) His reputation within his industry and community has been irreparably damaged.

(3) His wife, two children, and extended family have endured public embarrassment, financial instability, and emotional strain.

(4) He faces long-term barriers to meaningful employment, independent of the sentence imposed.

(5) He will be absent from his two children's lives, ages 11 and 6, during their critical

formative years, unable to be physically present to watch them grow and to help guide them through childhood. *See* PSR ¶ 62.

For a first-time offender, these consequences are real and punitive in ways that the Guidelines do not fully capture. The D.C. Circuit has repeatedly upheld below-Guidelines sentences in white-collar cases where the district court credited cooperation, remorse, and personal history. *See, e.g., United States v. Gardellini*, 545 F.3d 1089, 1095–96 (D.C. Cir. 2008) (affirming probationary sentence in tax fraud case despite advisory imprisonment range, emphasizing acceptance of responsibility and individualized assessment).

Comparable defendants in trade-secret and other white-collar cases routinely receive sentences at or below the advisory Guidelines range when they accept responsibility, cooperate with the Government, and present a low risk of recidivism. Courts and commentators have likewise emphasized that the loss-driven Guidelines applicable to economic crimes often overstate the need for incarceration in non-violent, first-offense cases.

> As a result of these problems with the design and operation of the loss table, a broad judicial consensus has developed that *Section 2B1.1's loss table overstates culpability in a great many cases*. For instance, New York federal courts, which handle some of the highest volumes of fraud cases in the country, have repeatedly criticized the grossly disproportionate nature of the loss tables. They have called the loss tables "patently absurd" and "a black stain on common sense" that rely upon a "flawed methodology for tabulating white-collar sentences[.]"Accordingly, courts have concluded that imposing sentences corresponding to the loss tables would "effectively guarantee that many such sentences would be irrational on their face." An array of white-collar scholars and commentators have likewise echoed these concerns. [footnotes omitted].

(Emphasis provided). Boss and Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It,* Ohio State Journal of Criminal Law, Vol 18:2:605 at 618 ("A Judicial Consensus Has Emerged that the Section 2B1.1 Loss Guideline is Unduly Harsh").

U.S. Sentencing Commission data further confirms that below-Guidelines sentences are the norm, not the exception, in white-collar cases involving cooperation and acceptance of responsibility.

11

In recent years, a majority of defendants sentenced for economic crimes, including fraud and intellectual property offenses, received sentences below the advisory range, either through variances or departures, particularly when they pled guilty and assisted authorities.

> During the last five fiscal years (FY2020-2024), there were 106 defendants whose primary guideline was §2B1.1, with a *Final Offense Level of 29 and a Criminal History Category of I*,[6] after excluding defendants who received a §5K1.1 substantial assistance departure. For the 104 defendants (98%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 61 month(s) and the median length of imprisonment imposed was 60 month(s). For all 106 defendants in the cell, the average sentence imposed was 60 month(s) and the median sentence imposed was 60 month(s).

PSR ¶ 131 (Emphasis provided).

This practice is firmly grounded in Supreme Court precedent, D.C. Circuit authority, and national sentencing data. Section 3553(a)(6) requires the Court to avoid unwarranted disparities among defendants with similar records who have engaged in similar conduct. Imposing a Guidelines or above-Guidelines sentence for a cooperative, first-time trade-secret defendant would create disparity with the sentences routinely imposed on similarly situated defendants nationwide.

On December 12, 2025, in recognition of the need to revise §2B1.1, the U.S. Sentencing Commission issued Proposed Amendments to the Sentencing Guidelines with a closing date of *today* (February 10, 2026) for public comment. (https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202512_rf-proposed.pdf). The proposal would amend §2B1.1 to revise the loss table to simplify application and adjust for inflation. If applied to this case, the amendment would reduce the loss guideline calculation by two levels (to +20 from +22), resulting in a total revised Estimated Offense Level of 27, with a Guidelines range of *70-87 months*. Although the amendment is not yet in effect, when it is issued Mr. Williams would be entitled to file a motion asking

---

[6] Similarly, Mr. Williams' PSR assessed an Offense Level of 29, with a Criminal History Category of I. *See* PSR ¶ 104.

the Court to resentence him in accordance with the adjusted loss table. *See* 18 U.S.C. § 3582(c)(2).[7] He respectfully requests that the Court consider the proposed amendment at his sentencing on February 24, 2026.

## VI. CONCLUSION

Mr. Williams appears before this Court with genuine remorse and a resolute commitment to rebuild his life in a lawful, responsible, and productive manner. He accepts full and unqualified responsibility for his conduct and does not seek to minimize its seriousness. As the Supreme Court has long recognized

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

*Gall v. United States*, 128 S. Ct. 586, 598 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

Accordingly, Mr. Williams respectfully requests that the Court impose a sentence which, at most, is capped at the bottom of the advisory Guidelines range, together with a term of supervised release that ensures continued mental health treatment and restitution.

---

[7] "The court may not modify a term of imprisonment once it has been imposed except that … in the case of a defendant who has been sentenced to a term of imprisonment *based on a sentencing range that has subsequently been lowered by the Sentencing Commission* pursuant to 28 U.S.C. 994(o) … the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(2) (Emphasis provided).

Respectfully submitted,

SECIL LAW PLLC

 /s/ *John P. Rowley III*
John P. Rowley III (DC Bar No. 392629)
Lionel Andre (DC Bar No. 422534)
1701 Pennsylvania Ave., N.W., Suite 200
Washington, D.C. 20006
jrowley@secillaw.com
(202) 642-0679
landre@secillaw.com
(703) 232-4622

*Counsel for Defendant Peter Williams*

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of February 2026, I electronically filed a true copy of the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all parties.

/s/ *John P. Rowley III*
John P. Rowley III