UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No. 25-cr-0322 (LLA) |
| : | |
| PETER WILLIAMS, : | |
| : | |
| Defendant. : | |

**DEFENDANT PETER J. WILLIAMS
REPLY TO GOVERNMENT SENTENCING MEMORANDUM**

The Government's Sentencing Memorandum ("Gov't Mem.") repeatedly substitutes rhetoric for proof, speculation for findings, and moral condemnation for Guidelines analysis. It treats untested loss assertions as dispositive and amplifies national-security hypotheticals to try to justify a top-of-range sentence, all while relying on sealed and conclusory victim narratives that neither Mr. Williams nor his counsel has been given a fair opportunity to examine. Sentencing must be driven by reliable evidence and the structured framework of the Guidelines and § 3553(a), not by inflammatory characterizations, double-counting of already-accounted-for facts, or "trust us" numbers offered without meaningful evidentiary support.

I. **THE GOVERNMENT'S MEMORANDUM IS RIFE WITH MATERIAL INACCURACIES AND MISLEADING CHARACTERIZATIONS.**

▪ **The Government unfairly exaggerates the offense conduct**. The Government charged Mr. Williams with two counts of theft of trade secrets in violation of 18 U.S.C. § 1832, and he pled guilty to that conduct. As noted in his Sentencing Memorandum at 5, the offenses did not involve the theft of classified information or the sale (or intended sale) of sensitive products to a foreign government. When confronted by investigators, Mr. Williams almost immediately accepted responsibility for his conduct, acknowledged the seriousness of the matter, and fully cooperated. Despite that, the Government is attempting to support a top-of-range sentence by implying that the

1

offense is akin to a national security violation. In support of that dubious assertion, it cites as sentencing comparisons economic espionage cases (18 USC § 1831) involving crimes committed to benefit the Chinese military and government. Gov't Mem. at 20-22. It also facetiously claims that Mr. Williams' knowledge and skill is so dangerous that he might harm national security while in prison. *Id.*, at 17.  If the Government actually believed this, it would have charged Mr. Williams with a different crime and never would have allowed him to await sentencing while in home detention.

- ▪ **The Government attributes a false rationale to Mr. Williams about why he sold to the broker.** It suggests that he selected the "Russian broker"[1] because "by his own admission, he knew they paid the most." Gov't Mem. at 14. That is not accurate and implies an ulterior motive that is not charged or supported by the evidence. The FBI's reports of interview state that Mr. Williams said he attempted to contact another broker, but the one based in Russia was the only one that responded. The record refutes the Government's insinuation that he wanted to sell to this particular broker without regard to any other considerations.

- ▪ **The claim that Mr. Williams "stood idly by while another employee was essentially blamed" for his conduct is not supported by the evidence.** The Government asserts that during Company One's internal investigation which led to his arrest, Mr. Williams scapegoated a subordinate – while failing to acknowledge that the employee was fired for misconduct. During the internal inquiry, Company One developed evidence that the employee's handling of intellectual property violated security protocols. This included indications that data may have been developed or stored in an internet-connected environment despite the air-gapped requirements. Once those concerns surfaced, Mr. Williams reported them to the FBI and instructed staff to report them to the appropriate internal security channels. Company One placed the employee on leave, secured his devices,

---

[1] The broker was located in Russia but is not owned by the Russian government.

confirmed the devices were experiencing connectivity issues, transferred them to the United States, and offered them to the FBI. The employee was ultimately terminated for breach of trust based on dual employment and improper handling of company IP. None of that establishes that Mr. Williams "stood idly by … and blamed" the employee for Mr. Williams' conduct. Instead, it reflects an internal investigation responding to credible red flags as they were identified, including escalation to law enforcement.

- **The Government overstates Mr. Williams' 2024 compensation.** It states that his 2024 income was "*in excess* of $775,000." Gov't Mem. at 7 (Emphasis provided). Company records reflect: $300,502 in base pay; $304,694 in bonus; and AUD $159,785, which at the applicable 2024 conversion (0.6598) equals $105,426.14 USD—totaling $710,622.14. The Court should not rely on inflated income figures when assessing motive, history and characteristics, ability to pay, or the § 3553(a) factors.

- **A basis exists for a sentencing departure under *United States v. Smith*.**[2] The Government recognizes that a guidelines departure under the D.C. Circuit's decision in *United States v. Smith,* 27 F.3d 649 (1994), as noted by the PSR, can be predicated on treatment of a foreign national more harshly because of his deportable status. Gov't Mem. at 11. It claims, though, that the rationale for such a departure is not applicable here as Mr. Williams may be treated more favorably than other prisoners if he is relocated to Australia. This is both speculative and overstated. The Government implies that a transfer might result in a shorter custodial period, yet it does not acknowledge that the opposite is equally possible. Australian authorities retain discretion in administering transferred sentences, and adjustments may be required to conform to Australian law and correctional practices. There is no guarantee that any transfer, if it occurs, would reduce Mr. Williams's custodial exposure;

---

[2] The parties have agreed not to seek a Guidelines variance.

in some circumstances, the effective period of confinement *could be longer*.

Moreover, the Government overlooks widely documented concerns about conditions in certain Australian correctional facilities, including overcrowding, resource limitations, and reports from oversight bodies questioning whether some institutions meet contemporary international correctional standards. These realities understandably factor into whether Mr. Williams will even seek a transfer, and underscore why any assumption that Australian confinement would be more favorable is unwarranted. Equally important, participation in the International Prison Transfer Program ("IPT") is neither automatic nor predictable. It requires approvals from multiple agencies in both countries, can take significant time to process, and may ultimately be denied. Sentencing decisions should therefore be grounded in the concrete custodial consequences Mr. Williams presently faces in the United States, not in speculative future possibilities.

Because Mr. Williams is a deportable non-U.S. citizen, Bureau of Prisons classification policies will assign him a Public Safety Factor that generally precludes placement in minimum-security institutions, even though his offense conduct, lack of criminal history, and personal characteristics would otherwise make him eligible. In addition, a final order of removal renders him ineligible for Earned Time Credits under the First Step Act, further increasing the practical severity of his sentence compared with that of similarly situated U.S. citizens.

These are real, immediate, and substantial collateral consequences of his immigration status. Speculation about a possible future transfer to Australia does not offset them, nor should it be treated as a basis to discount their sentencing significance. Any suggestion that the IPT program would "even things out" or result in more favorable treatment is conjectural and should not influence the Court's sentencing analysis.

II.   THE RECORD SUPPORTS APPLICATION OF U.S.S.G. § 4C1.1.

Counsel for Mr. Williams discussed the § 4C1.1 issue with the Government. The Government

recognizes that it is within the Court's discretion whether or not to apply that the two-level downward adjustment in § 4C1.1, but it does not object to the PSR's recommendation that the adjustment applies. Even in the absence of agreement, Mr. Williams satisfies his burden on this record. There is no evidence that he personally caused "substantial financial hardship" to Company One or Company Two. That inquiry is defendant-specific and the Sentencing Commission has expressly distinguished between loss calculations under § 2B1.1 and the narrower hardship inquiry required by § 4C1.1. Application Note 4(F) to § 2B1.1 identifies markers such as insolvency, bankruptcy, credit impairment, operational contraction, or comparable destabilizing financial consequences. None of those is present here and there is no evidence that either company became insolvent, entered bankruptcy, lost access to financing, defaulted on obligations, or was forced into material operational contraction as a result of Mr. Williams' conduct.

### III. THE GOVERNMENT'S LOSS ASSERTIONS REMAIN INSUFFICIENTLY SUBSTANTIATED.

The Government repeatedly references a $35 million loss figure while simultaneously limiting meaningful adversarial testing of the underlying methodology and evidentiary basis. Sentencing courts may consider a broad range of information, but factual findings must still rest on sufficiently reliable evidence. Here, the parties have stipulated to the loss amount for purposes of establishing the Base Offense Level under U.S.S.G. § 2B1.1. But the defense has not been provided with the discovery necessary to evaluate assumptions, offsets, or causal attribution upon which that figure may be based. Without that transparency, the Court should exercise caution before treating the asserted figure as dispositive for Guidelines adjustments, restitution determinations, or the § 3553(a) analysis.

### IV. THE COURT SHOULD EXERCISE PARTICULAR CAUTION REGARDING RESTITUTION.

The Government urges the Court to accept the $35 million loss figure as the amount of mandatory restitution. Mr. Williams respectfully submits that restitution must reflect actual, provable

loss directly attributable to the offense, not estimates, projections, or reputational harm untethered to concrete financial injury. Mr. Williams agreed to a loss figure of $35 million to establish the Guideline Base Offense Level. He did not stipulate to restitution in that amount, nor did he waive his right to challenge the Government's restitution claim. When loss calculations remain contested, courts routinely defer final restitution determinations or decline to impose inflated figures without reliable documentation.

The Supreme Court's recent decision in *Ellingburg v. United States*, 607 U.S. __, 2026, WL 135982 (2026) clarified that restitution under the Mandatory Victims Restitution Act ("MVRA") is criminal punishment, not just a civil remedy. The Court must therefore adhere to stricter constitutional and statutory guardrails. The controlling principle in this circuit is that the Government carries a distinct burden to prove actual loss for restitution, separate from the "reasonable estimate" allowed for sentencing guidelines. *United States v. Fair,* 699 F.3d 508 (D.C. Cir. 2012) (restitution under the MVRA is "limited to the actual, provable loss suffered by the victim and caused by the offense conduct.")[3] Mr. Williams accordingly requests that the Court schedule a restitution hearing for a final determination, not to exceed 90 days after sentencing, pursuant to 18 USC §3664(d)(5).

V. **COLLATERAL CONSEQUENCES AND CUSTODIAL REALITIES MATTER UNDER § 3553(A).**

As discussed above, Mr. Williams's status as a non-U.S. citizen carries concrete custodial consequences that the Government minimizes. Deportable status typically restricts institutional placement, limits access to rehabilitative programming and forecloses certain earned-time opportunities. Speculation about a possible international prisoner transfer does not negate these immediate realities; such transfers are discretionary, complex, and far from guaranteed. These collateral consequences appropriately factor into the Court's individualized § 3553(a) assessment.

---

[3] Mr. Williams has already agreed in his plea agreement to pay $1.3 million in restitution.

## VI. SENTENCING SHOULD BE PROPORTIONATE TO THE OFFENSE.

In its memorandum the Government relies on heightened rhetoric about national security implications and generalized reputational harm that risk overshadowing the structured sentencing analysis required by law. The advisory Guidelines already incorporate enhancements for loss, abuse of trust, and sophisticated conduct. Reusing those same facts to argue for the harshest possible sentence risks unwarranted double-counting.

Mr. Williams has accepted responsibility, has no prior criminal history, and has cooperated with the Government. The Probation Office's recommendation reflects a balanced assessment of these considerations. A sentence driven primarily by untested loss assertions or rhetorical amplification would exceed what is necessary to achieve deterrence, punishment, and respect for the law. The Probation Office's analysis deserves careful weight in this regard. Probation functions as a neutral arm of the Court, and its assessment reflects a more measured evaluation of the available record than the Government's advocacy-driven presentation. The Court should give due consideration to that recommendation before imposing a sentence.

## VII. CONCLUSION

For these reasons, Mr. Williams respectfully request that the Court:

1. Apply U.S.S.G. § 4C1.1 in calculating the advisory Guidelines range;

2. Exercise caution before adopting the Government's asserted loss figures or ordering $35 million in restitution absent reliable evidentiary support;

3. Give due weight to the Probation Office's analysis and recommendations; and

4. Impose a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).

A measured sentence consistent with those principles will promote respect for the law, ensure just punishment, and avoid unwarranted disparity while recognizing the full context of Mr. Williams' history, characteristics, and post-offense conduct.

Respectfully submitted,

SECIL LAW PLLC

 /s/ *John P. Rowley III*
John P. Rowley III (DC Bar No. 392629)
Lionel Andre (DC Bar No. 422534)
1701 Pennsylvania Ave., N.W., Suite 200
Washington, D.C. 20006
jrowley@secillaw.com
(202) 642-0679
landre@secillaw.com
(703) 232-4622

*Counsel for Defendant Peter Williams*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of February 2026, I electronically filed a true copy of the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all parties.

/s/ *John P. Rowley III*
John P. Rowley III